NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0470n.06
Filed: August 5, 2008

No. 07-4286

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| In re: Spinnaker Industries, Inc., | ) | |
| Debtor. | ) | |
| | ) | |
| MARK STICKEL, Liquidation Agent for the SKK Liquidation Trust, | ) | |
| Appellant, | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| SP ACQUISITION, LLC, n/k/a SPINNAKER COATING, LLC, | ) | |
| Appellee. | ) | |

Before: MOORE and SUTTON, Circuit Judges; ALDRICH, District Judge.[*]

SUTTON, Circuit Judge. While this case arises from a Chapter 11 proceeding, it amounts to nothing more than a contract dispute over the meaning of an asset-purchase agreement—and specifically whether the buyer's capped obligation to pay no more than $1.25 million of the sellers' professionals' fees overlaps with, or is independent of, the buyer's obligation to reimburse the sellers for the cost of financing the debtor in possession during the bankruptcy, a cost that as it turns out

_____

[*] The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

helped to fund some of the debtor-sellers' professionals' fees. Because the provision in the contract mandating the repayment of the debtor-in-possession financing works in concert with, rather than independently of, the agreement's cap on assumed liability for professionals' fees, the buyer has fulfilled its obligations, and we affirm the district court's grant of summary judgment in its favor.

## I.

In November 2001, Spinnaker Industries, Spinnaker Coating and Spinnaker Coating-Marine each filed a voluntary petition for Chapter 11 bankruptcy, and, acting as debtors in possession, they continued to operate their businesses during the consolidated bankruptcy proceeding. On January 4, 2002, the debtors filed a motion to sell substantially all of their assets, and on March 28, 2002, they closed a sale of their assets to SP Acquisition, which later changed its name to Spinnaker Coating, LLC (hereinafter "Spinnaker").

After the closing, at least one major category of costs—professionals' fees—remained unsettled. In March and April 2002, the estate professionals filed fee applications totaling $1,877,629, and the bankruptcy court approved the applications. Consistent with the bankruptcy court's order, Spinnaker paid the debtors' estate $500,479 to cover what it believed was its remaining professional-fee obligation under the contract. Mark Stickel, the liquidation agent for the debtors' liquidation trust, read the contract differently, and after Spinnaker denied requests for more fee payments, Stickel filed this adversary action in the bankruptcy court on September 13, 2004, seeking an additional $749,521.

Both parties moved for summary judgment. Spinnaker argued that it had fulfilled its fee obligation, capped at $1.25 million under the asset-purchase agreement, through four transactions: (1) its assumption of $377,684 in retainers that the debtors paid the professionals prior to petitioning for bankruptcy; (2) its assumption of $247,845 in debt drawn down from the debtor-in-possession financing to pay various professionals' fees; (3) its direct payments to the professionals of $123,992 on April 8, 2002; and (4) its final $500,479 payment on May 20 to the debtors' estate. Stickel conceded that Spinnaker's direct payments to the professionals counted toward its obligation, but he maintained that neither the retainers paid by the debtors nor Spinnaker's assumption of the debtors' bank-facility debt offset Spinnaker's liability. The bankruptcy court granted partial summary judgment to each party, holding that Spinnaker could credit the retainers but not the bank-facility payments against the $1.25 million fee obligation. Spinnaker appealed the adverse ruling to the district court, and the district court held that Spinnaker was entitled to credit the bank-facility payments (to the extent they covered professionals' fees) against its obligation. Stickel appealed that ruling here.

## II.

Under the asset-purchase agreement, Spinnaker paid a fixed price and assumed some of the debtors' liabilities in exchange for substantially all of the debtors' assets. Section 4 of the agreement detailed which liabilities Spinnaker did and did not assume:

4. Liabilities and Obligations

(a) <u>Non-Assumption of Liabilities</u>. Notwithstanding anything to the contrary contained herein and except as expressly set forth in Section 4(b), Buyer does not assume and shall have no responsibility or obligation whatsoever for any liabilities, commitments or obligations of Sellers of any kind or nature whatsoever . . . .

(b) <u>Assumed Obligations</u>. At the Closing, subject to the limitation set forth in section 4(c), Buyer shall assume the following liabilities and obligations (the "<u>Assumed Obligations</u>") of Sellers:

(i) post-Petition trade payables and liabilities incurred in the Ordinary Course of Business consistent with present practice in Sellers' chapter 11 cases (including an aggregate of up to $1,250,000 for court-retained professionals' fees and reimbursement of Sellers for court-approved amounts already paid, but excluding (x) any such professionals' fees in excess of such amount and (y) any amounts payable to Deloitte Touche under Section 3 of this Agreement);

(ii) Sellers' accrued pre-Petition liabilities for vacation, payroll, payroll Taxes, real estate and personal property Taxes, customer claims and rebates as set forth on **Schedule 4(b)(ii)** in an amount not to exceed $2,593,000, to the extent approved by the Bankruptcy Court and not satisfied before Closing;

(iii) key employee retention bonuses approved by the Bankruptcy Court in an amount not to exceed $750,000, and obligations under employee Contracts set forth on **Schedule 7(d)**;

(iv) certain other pre-Petition liabilities set forth on **Schedule 4(b)(iv)** in an amount not to exceed $2,475,000, to the extent approved by the Bankruptcy Court and not satisfied before Closing;

(v) the liabilities and obligations of Sellers under the Assigned Contracts that have accrued as of the Closing Date, including all Cure Amounts with respect thereto (except for Cure Amounts the payment of which would cause the Assumed Liabilities and DIP Payments to exceed $23,763,000, in which case Sellers shall make payments to the extent necessary to prevent such excess) and liabilities and obligations of Sellers under purchase orders and supply contracts; and

(vi) other post-Petition liabilities and obligations that have accrued as of the Closing Date in the Ordinary Course of Business, including but

not limited to employee-related obligations such as 401(k), pension, health insurance, etc. (but not with respect to employees of SCMI).

(c) Proceeds of Buyer Financing. The parties hereto acknowledge that Buyer contemplates arranging for the DIP Lenders to provide revolving and term credit facilities on terms and conditions equivalent to Sellers' existing financing or with modifications thereto acceptable to Buyer in its sole discretion (the "Buyer Financing"). Buyer shall use all or a portion of the proceeds of the Buyer Financing (and any other funds required) to repay the total amount of principal, accrued interest and other charges on Sellers' debtor in possession financing with the DIP Lenders at Closing (the "DIP Payment").

(d) Limitation on Assumed Obligations. Notwithstanding the above, in no event shall the aggregate amount of the Assumed Obligations as of the Closing Date . . . and the DIP Payment exceed $23,763,000.

JA 164–65. Elsewhere in the agreement, the parties stipulated that New York law would govern the contract, and in that State, as elsewhere, the court's task is to discern the parties' "purpose and intent" and to stay within the "four corners of the document" if the contract's terms are clear, *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).

This case turns principally on the interrelation of § 4(b)(i) and § 4(c). At closing, Spinnaker agreed under § 4(b)(i) to assume the debtors' post-petition trade payables and liabilities, including their professional-fee obligations. And it agreed under § 4(c) to repay the total amount of principal and interest the debtors incurred through their debtor-in-possession financing arrangement. The question is this: Does § 4(b)(i)'s $1.25 million cap on Spinnaker's professional-fee obligation apply to professionals' fees paid by the debtors with their debtor-in-possession financing facility? Like the district court, we think it does for several reasons.

First, the text of § 4(b)(i) supports this interpretation. It is the only provision of the contract dealing with professionals' fees, and it makes Spinnaker liable for only "$1,250,000 for court-retained professionals' fees" without regard to how those fees are initially paid or assumed. JA 164. It refers to "an aggregate" of such fees, contemplating that the payments credited toward the cap could be made at different times and in different ways, including through the funds provided by the debtor-in-possession financing facility. *Id*. And the cap contains a belt-and-suspenders component to it. After establishing the cap, the subsection says that Spinnaker's assumed obligations include "reimbursement" to the debtors for "court-approved amounts already paid . . . but excluding . . . any such professionals' fees in excess of" the cap. *Id*. The cap, in short, was a conspicuous limitation on Spinnaker's assumed obligations.

Second, nothing in § 4(c) says that the debtors' bank-facility payments to professionals cannot count toward the cap in § 4(b)(i). The two provisions, we recognize, set forth distinct financial obligations—as evidenced by the fact that § 4(d) limits Spinnaker's ultimate exposure, as measured by the combined sum of "the Assumed Obligations" and "the DIP Payment," to $23,763,000. JA 165. But nothing in the agreement says that these distinct obligations cannot overlap or that they must operate without reference to one another.

Third, the specific controls the general. *See Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956). The more specific references to professional-fee obligations in § 4(b)(i)—indeed the only references to the topic in the whole agreement—govern the more general

requirements of § 4(c), which do not rule out the possibility that fee obligations funded by the debtor-in-possession financing may be credited toward the cap. In this sense, the two provisions do not conflict but are interdependent. Debtor-in-possession financing covers precisely the liabilities that Spinnaker assumed under § 4(b)(i). Under 11 U.S.C. § 364(a), debtors in possession can "incur unsecured debt in the ordinary course of business" and the resulting unsecured creditors can claim "administrative expense" priority for such loans. This financing option "permits the debtor to focus its efforts on running its business, calming its employees and customers, and negotiating a plan of reorganization with its creditors and other parties in economic interest." 5 William L. Norton, Jr., Norton Bankruptcy Law & Practice 3d § 94:21 (2008). The types of debts allowable under "ordinary course of business" debtor-in-possession financing, 11 U.S.C. § 364(a), overlap with Spinnaker's express assumption of "post-Petition trade payables and *liabilities* incurred in the Ordinary Course of Business consistent with present practice in Sellers' chapter 11 cases" under § 4(b)(i), JA 164 (emphasis added). Under these circumstances, it would seem strange to interpret the general debtor-in-possession financing provision to eviscerate the specific professional-fee cap, especially where that financing is designed to cover the categories of obligations assumed under § 4(b)(i).

Fourth, a different interpretation would overlook our general obligation to give each provision "force and effect." *Muzak Corp.*, 133 N.E.2d at 690. Spinnaker and the debtors entered into the original asset-purchase agreement on January 18, 2002, and most of the debtors' professional-fee payments occurred after that date. Under Stickel's reading of the agreement, the bank-facility-repayment clause would have allowed the debtors unilaterally to alter SP's financial

obligations under the contract by changing the manner in which they paid the professionals' fees. On the one hand, if the debtors paid the relevant professionals' fees directly (without drawing down their bank facility) or delayed paying them at all (leaving the fees as "trade payables" or "liabilities" owed by Spinnaker), then any sums Spinnaker paid in relation to those fees would have been assumed "liabilities" or "reimbursement" of the debtors for "amounts already paid" that would have counted toward the agreement's cap under § 4(b)(i). On the other hand, Stickel's interpretation would have allowed the debtors to deprive Spinnaker of *any* benefit from the cap by simply paying the total professional-fee bill (or even just $527,628 of it) with funds drawn from their bank facility.

Nor is it just an end run around the professional-fee cap that this interpretation would allow. In addition to the professional-fee cap, there are other liability caps in § 4(b), including a $750,000 cap on employee-retention bonuses, a $2.6 million cap on employee and tax liabilities and a $2.5 million cap on other specified liabilities, that address liabilities that may or may not be payable through debtor-in-possession financing. Were Stickel's interpretation of the contract correct, the debtors might have rendered each of these caps a dead letter by paying those expenses through debtor-in-possession financing. The parties have given us no reason why they would have treated expenses paid with bank-facility funds differently from those paid directly or left unpaid. Our obligation under New York law is to discern the parties' "purpose and intent" from the "four corners of the document," *W.W.W. Assocs.*, 566 N.E.2d at 642, and nothing in the agreement suggests that the parties intended to design caps that could be so easily evaded.

III.

For these reasons, we affirm.